UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                       :

TIMOTHY KRAFT,
                       :

              Plaintiff,
                       :       **OPINION**

     - against -
                       :       07 Civ. 02978 (DC)

THE CITY OF NEW YORK et al.,
                       :

              Defendants.
                       :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**      ROSE M. WEBER, ESQ.
                    Attorney for Plaintiff
               225 Broadway, Suite 1607
               New York, New York  10007

               MICHAEL A. CARDOZO, ESQ.
               Corporation Counsel of the City of New York
                 Attorney for City of New York Defendants
                    By:  Elizabeth A. Wells, Esq.
                      Assistant Corporation Counsel
               100 Church Street
               New York, New York  10007

               HOEY, KING, TOKER & EPSTEIN
                 Attorneys for Common Ground Community
                 Defendants
                    By:  Glen H. Parker, Esq.
                        Danielle M. Dandrige, Esq.
               55 Water Street, 28th Floor
               New York, New York  10041

               LESTER, SCHWAB, KATZ & DWYER LLP
                 Attorneys for Center for the Urban
               Community Services Defendants
                  By:  Thomas A. Catalano, Esq.
               120 Broadway
               New York, New York  10271

**CHIN, District Judge**

        On May 18, 2006, plaintiff Timothy Kraft was

transported by members of the New York City Police Department

(the "NYPD") and the New York City Fire Department (the "FDNY")

to Bellevue Hospital following two different incidents with a

tenant and staff at his apartment building.  Doctors at Bellevue
Hospital kept plaintiff overnight for observation and later
admitted him over his objection to the psychiatric ward, where he
remained until his discharge on May 23, 2006.

In this case, Kraft sues the City of New York (the
"City"); Police Officers Brett Bara and Jose Bueno (the "police
defendants"); the New York City Health and Hospitals Corporation
("HHC"); Dr. Eli Greenberg, Dr. Fadi Haddad, and Dr. Alyson Maloy
(the "doctor defendants"); Amy Cohen; an unnamed emergency
medical services ("EMS") supervisor; Common Ground Community
H.D.F.C., Inc. ("CGC"), Oretha Franklin, Michael Giordano,
Rosanne Haggerty, and Nancy Porcaro (collectively the "CGC
defendants"); and the Center for Urban Community Services
("CUCS"), Stacy Neri, and Dawn Bradford (collectively the "CUCS
defendants") for damages arising out of his purportedly wrongful
transport and admission to Bellevue Hospital.  He asserts claims
under 42 U.S.C. § 1983 and state law.

Defendants move for summary judgment dismissing all
claims pursuant to Federal Rule of Civil Procedure 56.  For the
reasons that follow, defendants' motions are granted, and the
complaint is dismissed.

**BACKGROUND**

A.   **The Facts**

On a motion for summary judgment, the Court construes
the evidence in the light most favorable to the non-moving party.
The following facts are drawn from the exhibits, declarations,

and deposition transcripts submitted by the parties. Conflicts in the evidence have been resolved in plaintiff's favor.

Plaintiff resided at the Prince George, a CGC-operated residential building in Manhattan. (Pl. Dep. 5:1-5; Haggerty Dep. 23:10-18). CGC is a non-profit entity that owns and manages several residential properties for use in assisting the homeless. (Dandrige Decl. Ex. B at 1). CUCS is a non-profit social services organization that assists chronically homeless individuals, and it provides such assistance to residents at the Prince George. (Id.).

On May 18, 2006, plaintiff was involved in an incident with another tenant, Thomas Hansen, a wheelchair-bound individual who plaintiff saw get out of his wheelchair on many prior occasions. (Pl. Dep. 10-11). Plaintiff was walking out of the Prince George when Hansen (in his wheelchair) approached him and made insulting and threatening remarks. (Id. at 10:23-25, 14:1-12). Plaintiff "told him to go to hell" and continued walking up the block. (Id. at 15:7-8). Hansen pulled up along side plaintiff, stood up from his wheelchair, and hit plaintiff in the face. (Id. at 15:14-18). After plaintiff attempted to punch Hansen several times, he turned around and walked away. (Id. at 17:19-23). Oretha Franklin, a member of the security staff at the Prince George, witnessed plaintiff attempting to punch Hansen (id. at 94:7-95:7; Franklin Dep. 9-10, 31:13-32:19) and notified her supervisor, Michael Giordano, CGC's assistant director of

building operations including security (Giordano Dep. 7:11-15, 8:23-9:3, 76; Weber Decl. Ex. M at NYC 0005).

Later that day, between 4:15 p.m. and 4:30 p.m., plaintiff exited the building, and Hansen, who was outside, started to threaten him again. (Pl. Dep. 89:9-14). Plaintiff approached Hansen, but Giordano stepped between the two men, telling plaintiff he could not hit Hansen. (Id. at 89:13-16, 104:1-3). Plaintiff tried to explain that Hansen had punched him in the face earlier. (Id. at 104:3-4). At that point, Giordano pushed plaintiff. (Id.).[1] Plaintiff again tried to explain the earlier incident, and Giordano said he did not care and pushed plaintiff again. (Id. at 104:4-5). Giordano proceeded to push plaintiff a third time, at which point, plaintiff pushed him back. (Id. at 90:1-7). Plaintiff then kicked Hansen's wheelchair and told him to get out of the chair, calling him a "phoney bastard." (Id. at 102:21-22). He then walked back into the building. (Id. at 102:23-25).

At that point, Dawn Bradford, a CUCS employee who had witnessed the incident, directed Franklin to call 911. (Bradford-Watt Dep. 4, 86-87). Giordano, Bradford, and Franklin informed Stacey Neri, a CUCS social worker, about the incidents involving plaintiff. (Neri Decl. ¶¶ 5, 10-13). After conferring with Bradford, Neri concluded that plaintiff should be evaluated at Bellevue's Comprehensive Psychiatric Emergency Program

---

[1]    Giordano denies pushing plaintiff (see Giordano Dep. 94:10-14), but for the purposes of this motion I assume plaintiff's version is true.

("CPEP") and called 911 again to follow-up.  (Id. at ¶¶ 15-16).

Police Officers Brett Bara and Jose Bueno of the NYPD arrived at the Prince George and gathered information from Neri, Giordano, Hansen, and plaintiff. (Pl. Dep. 137-40; Bara Dep. 29-30).  Plaintiff overheard Neri tell the officers that plaintiff had beat up a man in a wheelchair unprovoked.  (Pl. Dep. 125:14-22).  Neri further informed them that plaintiff "had become verbally abusive to her" and "was not in the right state of mind at that point."  (Bueno Dep. 27:25-28:7).  The officers took formal complaints from both Hansen and plaintiff.  (Wells Decl. Ex. M at NYC 0266-73).  When the officers asked plaintiff to describe what happened, plaintiff raised his voice and spoke loudly, prompting the officers to tell him to calm down.  (Pl. Dep. 140:10-12, 141:10-11, 142:9-10).  Officer Bueno explained to plaintiff that EMS had been called and that he would have to wait for EMS to arrive and evaluate him.  (Bueno Dep. 30:9-19).  Plaintiff maintains that the officers told him to "go to the corner and stay there and don't move."  (Pl. Dep. 127:19-20).  Plaintiff did so.  (Id. at 147:11-18; 148:23-49:4).

EMS arrived at approximately 5:14 p.m.  (Dandrige Decl. Ex. O at NYC 0060).  Two EMS workers spoke with the officers, Neri, and plaintiff.  (Pl. Dep. 155-57).  Neri showed plaintiff's file to the EMS workers.  (Id. at 156:21-23).  After some discussion, the EMS workers radioed for their supervisor to come to the Prince George.  (Id. at 164:24-65:22).  The supervisor arrived approximately ten to fifteen minutes later and spoke with

the EMS workers, Neri, and the officers.  (Id. at 165:23-25,
166:19-67:5).  He then pointed east and said "let them over there
decide."  (Id. at 167:7-14).  Plaintiff then walked to the
ambulance on his own.  (Id. at 168:10-69:4; Bara Dep. 44:20-22).
The ambulance transported plaintiff to Bellevue Hospital where
EMS escorted plaintiff inside to the admission desk.  (Pl. Dep.
170:6-10, 175:1-11).  Officers Bara and Bueno followed the
ambulance to Bellevue, but did not enter the hospital.  (Id. at
170:9-10, 176:8-9).

          Dr. Greenberg was the attending psychiatrist in the
psychiatric emergency room at Bellevue Hospital on the evening of
May 18, 2006, and spoke with the EMS workers who transported
plaintiff.  (Greenberg Decl. ¶¶ 5-6).  An unidentified medical
student first interviewed plaintiff.  (Maloy Dep. 59:22-60:3).
The medical student spoke with Neri who informed her that
plaintiff had punched a man in a wheelchair unprovoked and that
plaintiff had been paranoid and irritable and was following staff
members around the building.  (Maloy Decl. ¶ 8; Wells Decl. Ex. N
at NYC 0051).  The medical student also spoke with plaintiff's
neighbor, Cleo Capers, who stated that plaintiff had been more
agitated over the past two years and had expressed having trouble
with the staff in the building.  (Wells Decl. Ex. N at NYC 0051).
The neighbor, however, had never witnessed plaintiff start any
trouble.  (Id.).

          Dr. Maloy then interviewed plaintiff together with the
medical student.  (Maloy Decl. ¶ 7).  The interview lasted

between fifteen and forty-five minutes. (Maloy Dep. 55:2-6). According to Dr. Maloy, plaintiff became very angry while describing what had happened that day. (Maloy Decl. ¶ 10). Dr. Maloy requested more references from plaintiff, explaining that because he only interacted with his neighbor occasionally, she felt more references were needed. (Pl. Dep. 186:25-88:4). Plaintiff refused to provide her with anymore references. (Id. at 187:16-20).

After interviewing plaintiff, Dr. Maloy determined the global assessment of plaintiff's functioning to be at a "thirty-five" out of "one-hundred."[2] (Maloy Decl. ¶ 11). She also found his affect to be "grandiose." (Maloy Dep. 55:16-18). She determined that plaintiff demonstrated poor judgment in the incidents involving Hansen and Giordano and that this judgment combined with his grandiosity could be a sign of hypomania or mania, a potentially dangerous condition if untreated. (Maloy Decl. ¶ 12). She concluded that plaintiff's symptoms interfered with his ability to engage in the community in a safe way. (Id. at ¶ 11). Dr. Maloy then presented plaintiff's case to Dr. Greenberg. (Id. at ¶ 11). At the time, Dr. Maloy was "leaning towards" recommending that plaintiff be kept for further observation. (Id. at ¶ 12).

Dr. Greenberg then interviewed plaintiff. (Greenberg Decl. ¶ 7). Based on his direct observations of plaintiff, Dr.

---

[2]     A "one" is considered unable to function, and a "one-hundred" is considered completely functional. (Maloy Decl. ¶ 11).

Maloy's presentation, his own review of plaintiff's medical chart, the information from collateral sources, and his conversation with the EMS workers, Dr. Greenberg concluded that plaintiff exhibited poor judgment and potentially aggressive and violent verbal and physical behavior.  (Id. at ¶¶ 8-9).  Dr. Greenberg determined that plaintiff should be held for further observation under New York Mental Hygiene Law ("M.H.L.") § 9.40. (Id. at ¶ 10).

Dr. Maloy certified on the M.H.L. § 9.40 form that she examined plaintiff and determined that he might have a mental illness requiring immediate observation, care, and treatment in the CPEP at Bellevue Hospital.  (Maloy Decl. ¶ 14; Wells Decl. Ex. N at NYC 0104).  She further certified that, if untreated, plaintiff's illness would likely result in serious harm to himself or others.  (Maloy Decl. ¶ 14; Wells Decl. Ex. N at NYC 0104).  Dr. Maloy met with plaintiff a second time and informed him that he was being held for further observation for up to seventy-two hours.  (Maloy Decl. ¶ 15).  She provided plaintiff with a copy of a Notice of Status and Rights of CPEP Emergency Admission.  (Id.).  According to Dr. Maloy, at this point, plaintiff became very angry, stood up from his chair, came within inches of her face, and invaded her personal space.  (Id. at ¶ 16).  Plaintiff was not violent nor did he attempt to hit Dr. Maloy.  (Maloy Dep. 47:8-11; Wells Decl. Ex. N at NYC 0055). Plaintiff denies standing up from his chair, raising his voice, or coming close to Dr. Maloy.  (Kraft Decl. ¶¶ 4-5).

Plaintiff spent the night of May 18th sleeping intermittently in the waiting room. (Pl. Dep. 188:5-13). He awoke around 7:00 or 8:00 a.m. the next morning (id. at 188:22-23) and later met with Amy Cohen, a psychology intern. (Id. at 192:20-22; Wells Decl. Ex. N at NYC 0065-66). Cohen interviewed plaintiff, who recounted the prior incidents at the Prince George. (Wells Decl. Ex. N at NYC 0066). Cohen also spoke with Neri who informed her that plaintiff had demonstrated a recent change in mental status, becoming increasingly agitated the previous day. (Id.). Neri also told Cohen about the two incidents at the Prince George. (Id.). After interviewing plaintiff, Cohen presented plaintiff's case to Dr. Fadi Haddad, the attending psychiatrist in the psychiatric emergency room of the CPEP on May 19, 2006. (Haddad Decl. ¶¶ 7-8). Dr. Haddad then spoke to a collateral source, Dr. Jack Jurich, plaintiff's outpatient therapist. (Id. at ¶ 10). Dr. Jurich informed him that plaintiff had a history of impulse control and a paranoid personality disorder. (Id.). Dr. Haddad reviewed plaintiff's medical chart, including Dr. Maloy's report of plaintiff's confrontation with her. (Id. at ¶ 11). He concluded that plaintiff's reported behavior with Dr. Maloy showed poor impulse control, and that plaintiff displayed paranoid behavior. (Id.).

Dr. Haddad and Cohen then met with plaintiff approximately two to three hours after Cohen's initial interview. (Pl. Dep. 199-200). The meeting lasted fifteen to twenty minutes. (Id. at 200:7-8). Dr. Haddad informed plaintiff that

he wanted to keep him in the hospital for a longer period of
time.  (Id. at 200-01).  He then certified that he had examined
plaintiff and had reasonable cause to believe that plaintiff had
a mental illness requiring immediate observation, care, and
treatment in a mental hospital under M.H.L. § 9.39.  (Haddad
Decl. ¶ 12; Wells Decl. Ex. N at NYC 0101).  He further certified
that if plaintiff remained untreated, the condition would likely
result in serious harm to himself or others.  (Haddad Decl. ¶ 12;
Wells Decl. Ex. N at NYC 0101).  Plaintiff received notification
of his M.H.L. § 9.39 status.  (Haddad Decl. ¶ 15).

      Plaintiff spent the night of May 19th again sleeping
intermittently in the waiting room.[3]  (Pl. Dep. 207:5-14).  He
awoke the next morning, was given breakfast, and was later
admitted to the psychiatric ward.  (Id. at 207-08).  That
morning, Dr. Richard Nadrich confirmed Dr. Haddad's determination
under M.H.L. § 9.39.  (Haddad Decl. ¶ 13; Wells Decl. Ex. N at
NYC 0068, 0102).  Plaintiff, however, recalls seeing no doctors
on May 20th.  (Pl. Dep. 215:16-18).

      Plaintiff met with Dr. Terrance Leingang on Monday, May
22, 2006.  (Id. at 225:8-18).  Dr. Leingang interviewed
plaintiff with an intern and a social worker present. (Id. at
225:12-24).  The interview lasted approximately forty to forty-
five minutes.  (Id. at 229:1-3).  Dr. Leingang diagnosed
plaintiff with psychothymic disorder, a mild form of manic

---

      [3]      It is unclear from the exhibits provided whether
"waiting room" is synonymous with "intake room." (See Pl. Dep.
208:13-15).

depressive disorder, and personality disorder with obsessional,
paranoid, and narcissistic trends.  (Leingang Dep. 47:19-23;
Wells Decl. Ex. N at NYC 0248).  He concluded that plaintiff was
not bipolar, but "clearly had problems."  (Leingang Dep. 58:22-
59:3).  Dr. Leingang determined that plaintiff's primary
condition was his obsessional disorder, which could be treated
outside of the hospital, though he concluded that doctors could
have made the decision to medicate plaintiff over plaintiff's
objection.  (Id. at 59:5-13).  Dr. Leingang decided that
plaintiff should continue therapy with Dr. Jurich after his
discharge and subsequently referred him back to Dr. Jurich.
(Wells Decl. Ex. N at NYC 0249).  Plaintiff was discharged from
Bellevue Hospital on Tuesday, May 23, 2006.  (Id. at NYC 0245).

B.   **Prior Proceedings**

Plaintiff filed the complaint in this action on April
13, 2007.  The complaint asserts four claims against all
defendants under 42 U.S.C. § 1983 for substantive due process
violations, procedural due process violations, false arrest, and
malicious abuse of process.  It also asserts a municipal
liability claim against the City and the HHC pursuant to Monell
v. Department of Social Services, 436 U.S. 658 (1978).  The
complaint also alleges eight additional state law claims against
all defendants for false arrest, false imprisonment, malicious
abuse of process, intentional infliction of emotional distress,
negligent infliction of emotional distress, prima facie tort,
negligent hiring and retention, and negligent training and

- 11 -

supervision.  Various cross claims were then filed among
defendants, none of which are the subject of the motions before
the Court.  On August 29, 2008, on consent of the parties, the
Court entered an order dismissing plaintiff's claims against Amy
Cohen without prejudice.  On May 7, 2009, on stipulation of the
parties, the Court entered an order dismissing with prejudice the
following claims:  (1) plaintiff's federal claims against all CGC
and CUCS defendants; (2) plaintiff's procedural due process
claims against the individual City police defendants; and (3)
plaintiff's state and federal malicious abuse of process claims
against the individual City police defendants

The parties completed discovery.  These motions
followed.

### DISCUSSION

### A.  Applicable Law

#### 1.  Summary Judgment Standard

The standards governing motions for summary judgment
are well-settled.  A court may grant summary judgment only where
there is no genuine issue of material fact and the moving party
is therefore entitled to judgment as a matter of law.  See Fed R.
Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 585-87 (1986).  Summary judgment should be
denied "if the evidence is such that a reasonable jury could
return a verdict" in favor of the non-moving party.  See NetJets
Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d

Cir. 2008).   In deciding a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor.   In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008).   The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."   W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotation marks omitted).

   2.   **Section 1983**

        Section 1983 imposes civil liability on any party who, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; see also Williams v. N.Y. City Hous. Auth. & Local 237, I.B.T., No. 05 Civ 2750 (DC), 2007 U.S. Dist. LEXIS 91134, at **12-13 (S.D.N.Y. Nov. 30, 2007), aff'd, 335 Fed. App'x 108 (2d Cir. 2009).   To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that (1) defendants acted under "color of state law" (2) to deprive him of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States.   Pitchell v. Callan, 13 F.3d 545, 547-48 (2d Cir. 1994);

see also Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

## B.   Federal Claims Against the Doctor Defendants

### 1.   Substantive Due Process

Plaintiff alleges that the City doctor defendants violated his right to substantive due process under the Fourteenth Amendment by involuntarily committing him to Bellevue Hospital.  He contends that the doctor defendants' diagnoses and determinations under M.H.L. §§ 9.40 and 9.39 were incorrect and that they were based upon either false factual allegations about plaintiff or facts unsupportive of such determinations and diagnoses.

#### a.   Applicable Law

The Second Circuit has recognized that "[a]n involuntary civil commitment is a 'massive curtailment of liberty.'"  Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995) (quoting Vitek v. Jones, 445 U.S. 480, 491 (1980)). Therefore, "[a]s a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." Id. (citing O'Connor v. Donaldson, 422 U.S. 563, 575 (1975)).  Due process does not, however, "require a guarantee that a physician's assessment of the likelihood of serious harm be correct." Id. at 1062.  The Second Circuit has instructed that "a doctor will not be liable under § 1983 for the treatment decisions she makes unless such

- 14 -

decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" Kulak v. City of New York, 88 F.3d 63, 75 (2d Cir. 1996) (alteration in original) (quoting Youngberg v. Romeo, 457 U.S. 307, 323 (1982)).

A doctor's decision to commit someone involuntarily under the M.H.L. "does not ordinarily involve matters 'within the layman's realm of knowledge.'" Olivier v. Robert L. Yeager Mental Health Ctr., 398 F.3d 183, 190 (2d Cir. 2005) (quoting Sitts v. United States, 811 F.2d 736, 740 (2d Cir. 1987)). The decision is "'based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician.'" Id. (quoting Addington v. Texas, 441 U.S. 418, 430 (1979)). Whether it violates a person's right to substantive due process "'turns on the meaning of the facts which [typically] must be interpreted by expert psychiatrists and psychologists.'" Id. at 191 (emphasis and alteration in original) (quoting Addington, 441 U.S. at 429).

"The plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards." Fisk v. Letterman, 501 F. Supp. 2d 505, 522 (S.D.N.Y. 2007) (citing Olivier, 398 F.3d at 190-91; Drozdik v. City of New York, No. 01 Civ. 3300 (RCC) (GWG), 2003 WL 366639 (S.D.N.Y. Feb. 20, 2003)). In the absence of such evidence, summary judgment is appropriate. See Kulak, 88 F.3d at

- 15 -

75 (affirming summary judgment where plaintiff's expert disagreed with defendants' diagnosis of plaintiff, but failed to assert "that it was substantially below accepted professional judgment"); Fisk, 501 F. Supp. 2d at 524; Algarin v. N.Y. City Dep't of Corr., 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006), aff'd 267 F. App'x 24 (2d Cir. 2008); see also Olivier, 398 F.3d at 191.

### b.   Application

Construing the evidence in the light most favorable to plaintiff, I conclude that a reasonable jury could not find that the doctor defendants' determinations and actions, even if incorrect, constituted a substantial departure from accepted judgment, practice, or standards.

In support of his claim, plaintiff offers the expert testimony and report of Dr. Mirjana Blokar, a board-certified, licensed psychiatrist. (Wells Decl. Ex. K at 1; Blokar Dep.). Dr. Blokar, however, fails to conclude anywhere in her report or deposition that the doctor defendants' diagnoses, actions, and subsequent determinations under M.H.L. §§ 9.40 and 9.39 fell substantially below accepted medical standards. Excerpts from her deposition testimony provided by the City and plaintiff largely consist of questions and disagreements about the doctor defendants' perceptions, diagnoses, and subsequent actions. (See Blokar Dep. 46:18-47:10, 60:9-15, 60:19-25, 61:8-12, 94:15-16). Such statements are not sufficient to raise material issues regarding the treatment decisions made by the doctor defendants.

- 16 -

See Kulak, 88 F.3d at 75 (finding that expert's disagreement with
diagnosis made by defendant doctors failed to raise material
issue regarding their treatment decisions and did not constitute
determination by expert that defendant doctors' diagnosis fell
substantially below accepted professional judgment).  Although
Dr. Blokar, in one instance, deems a doctor's note in the medical
records "unprofessional" (Blokar Dep. 60:13-15), she does not
identify any standards from which it departs.  Further,
critiquing the note's form is not equivalent to critiquing the
physician's determination, which is the relevant inquiry before
this Court.  In fact, the only reference Dr. Blokar makes in
either her report or her deposition to any sort of medical
standard is when she explains in her deposition that to be
involuntarily hospitalized, one has to be deemed imminently
dangerous to himself or others.  (Id. 98:2-17).  She fails,
however, to assert that the doctor defendants' determination that
plaintiff was imminently dangerous substantially departed from
accepted judgment, practice, or standards.

        To the extent that Dr. Blokar determined from her own
examination of plaintiff that he exhibited no symptoms indicative
of a dangerous mental illness requiring psychiatric
hospitalization (Wells Decl. Ex. K at 2-3), such a finding is
insufficient to meet the substantial departure standard under
Kulak.  Dr. Blokar met with plaintiff on one occasion in March of
2009, nearly three years after plaintiff's involuntary
confinement at Bellevue Hospital in May of 2006.  (Id. at 1).

- 17 -

The fact that plaintiff appeared healthy in 2009 with no sign of any dangerous mental condition has little bearing on what the doctor defendants may have perceived three years earlier. Notably, Dr. Blokar even qualifies one of her findings in this regard.  (Id. at 3 ("Mr. Kraft does not suffer a dangerous mental illness and he does not require treatment with psychotropic medications at this time.") (emphasis added)).

Dr. Blokar's report and testimony also ignore the fact that five different doctors and two medical and psychology interns examined plaintiff over the course of his five-day confinement at Bellevue Hospital.  (Greenberg Decl. ¶¶ 7-10; Haddad Decl. ¶¶ 8-9, 11-14; Leingang Dep. 58-59; Maloy Decl. ¶¶ 8-14).  Six of those seven individuals were involved in the initial decisions to retain and later admit plaintiff. (Greenberg Decl. ¶¶ 7-10; Haddad Decl. ¶¶ 8-9, 11-14; Maloy Decl. ¶¶ 8-14).  The four doctors involved all concluded that plaintiff may have had a mental illness that would likely result in serious harm to himself or others if left untreated.  (Greenberg Decl. ¶¶ 7-10; Haddad Decl. ¶¶ 8-9, 11-14; Maloy Decl. ¶¶ 9-14; Wells Decl. Ex. N at NYC 0068, 0102).  These determinations were based on their own observations of plaintiff, their review of his medical records, and information elicited from him directly and other collateral sources.  (Greenberg Decl. ¶¶ 6-9; Haddad Decl. ¶¶ 8-12; Maloy Decl. ¶¶ 7-10, 13; Wells Decl. Ex. N at NYC 0051, NYC 0055-57, NYC 0065-67).

Plaintiff's contention that the doctor defendants relied on disputed facts and false allegations -- primarily, the information provided by Stacey Neri that plaintiff attacked a wheelchair-bound individual unprovoked and the claim by Dr. Maloy that plaintiff displayed threatening behavior upon learning that he was going to be held for further observation -- is rejected. (Pl. Mem. 17-18, 20). First, each doctor defendant stated that no one factor was determinative in making his or her decision to retain or admit plaintiff, but rather, each relied on the total universe of information and observations collected -- including their own interactions with plaintiff. (Greenberg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13). Second, even assuming that such allegations were false, there is no evidence that the doctor defendants should have known that to be the case or should have discredited the claim by Dr. Maloy, their own colleague, that plaintiff had invaded her personal space and made her fearful when she told him that he was going to be held for further observation.[4] Plaintiff's own expert even seems to suggest that because of plaintiff's alleged altercation with a wheelchair-bound individual, the doctor defendants were justified in keeping plaintiff for further observation. (Blokar Dep. 96:8-15) ("[I]f you just got that history that they just attacked somebody, you of course want to retain them and find out if they are

---

[4] Although there is some conflict between plaintiff's and Dr. Maloy's account of how plaintiff reacted, there is nothing to suggest that Dr. Maloy was lying. The medical records document the encounter and even candidly state that plaintiff "was not violent." (Wells Decl. Ex. N at NYC 0055).

dangerous."); see also (id. at 97:24-98:1); (Wells Decl. Ex. K at 3).

Because plaintiff fails to offer any evidence that the doctor defendants' diagnoses, actions, and subsequent determinations under M.H.L. §§ 9.40 and 9.39 fell substantially below accepted medical standards, no reasonable jury could conclude that they violated plaintiff's substantive due process rights under the Fourteenth Amendment.[5] The City's motion for summary judgment is therefore granted as to the substantive due process claim against the doctor defendants.

### 2. False Arrest

Plaintiff claims that the doctor defendants violated his Fourth Amendment rights by subjecting him to false and improper arrest while at Bellevue Hospital because plaintiff did not meet the criteria for involuntary hospitalization.

### a. Applicable Law

An involuntary confinement to a hospital constitutes a seizure within the meaning of the Fourth Amendment. Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993); Drozdik, 2003 WL 366639, at *5. Such an "infringement" is "tantamount to the infringement of being arrested." Glass, 984 F.2d at 58 (internal citation

---

[5]    Further, not only does Dr. Blokar fail to assert that the doctor defendants' determinations under M.H.L. §§ 9.40 and 9.30 fell substantially below accepted medical standards, she in fact implies in her report that the initial M.H.L. § 9.40 determination to hold plaintiff for up to seventy-two hours was justified.  (Wells Decl. Ex. K at 3) ("staff at Bellevue did not have any justification for keeping Mr. Kraft involuntarily hospitalized beyond the requisite 72 hours") (emphasis added).

omitted). "The Fourth Amendment requires that an involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'" Id. (quoting Villanova v. Abrams, 972 F.2d 792, 795 (7th Cir. 1992)).

Pursuant to M.H.L. § 9.40, a comprehensive psychiatric emergency program can retain a person for a period of seventy-two hours when the individual is "alleged to have a mental illness for which immediate observation, care and treatment in such program is appropriate and which is likely to result in serious harm to the person or others." N.Y. Mental Hygiene Law ("M.H.L.") § 9.40(a) (McKinney 2009). Under M.H.L. § 9.39, a hospital can admit a person on that same basis and retain him for a period of fifteen days. Id. § 9.39(a). The M.H.L. requires that this finding be made before the individual is committed for an extended period of time. Drozdik, 2003 WL 366639, at *5 (citing M.H.L. § 9.39(a)).

## b. **Application**

Here, the doctor defendants had probable cause and reasonable grounds for believing that plaintiff was subject to seizure under the M.H.L. It is undisputed that the doctor defendants determined that plaintiff might have a mental illness that would likely result in serious harm to himself or others if left untreated. Based on this determination, they initially decided to hold him for further observation under M.H.L. § 9.40

- 21 -

and later admit him to the psychiatric ward under M.H.L. § 9.39. As discussed in Section B(1)(b), _supra_, their medical judgments were based on their own observations as well as information from collateral sources, some of which alleged violence and threatening behavior on the part of plaintiff.  See _Drozdik_, 2003 WL 366639, at *5.  Moreover, the fact that plaintiff's expert, Dr. Blokar, disagrees with those medical judgments is not enough to defeat summary judgment because she failed to conclude that the doctor defendants' determinations fell substantially below accepted medical standards.  See _Kulak_, 88 F.3d at 75 ("[A] doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" (alteration in original) (quoting _Youngberg_, 457 U.S. at 323)).  Therefore, the City's motion for summary judgment is granted as to the false arrest claim against the doctor defendants.

### 3.   Malicious Abuse of Process

Plaintiff accuses the doctor defendants of malicious abuse of process under § 1983.

#### a.   Applicable Law

A defendant can be held liable for malicious abuse of process when he

> (1) employs regularly issued legal process to
> compel performance or forbearance of some act
> (2) with intent to do harm without excuse

- 22 -

[or] justification, and (3) in order to
obtain a collateral objective that is outside
the legitimate ends of the process.

Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003)

(internal citation and quotation marks omitted).  The crux of a

malicious abuse of process claim is the collateral objective

element.  To meet this element, a plaintiff must prove not that

defendant acted with an improper motive, but rather an improper

purpose.  Id. at 77 (noting that to state a claim for abuse of

criminal process, a plaintiff "must claim that [authorities]

aimed to achieve a collateral purpose beyond or in addition to

his criminal prosecution").  For example, tampering with

evidence is not considered abuse of process because the goal or

purpose -- convicting the defendant -- is a legitimate use of

process.  See Chamberlain v. Lishansky, 970 F. Supp. 118, 122

(N.D.N.Y. 1997).  Fabricating assault charges to save one's job

could be abuse of process, however, because "safeguarding one's

own employment lies outside the legitimate goal of criminal

process."  Hernandez v. Wells, 01 Civ. 4376 (MBM), 2003 U.S.

Dist. LEXIS 21146, at *27 (S.D.N.Y. Nov. 18, 2003).

    b.    **Application**

        Plaintiff argues that he was confined at Bellevue

Hospital "for the financial purpose of keeping psychiatric beds

filled and [HHC] hospitals running in the black" and that the

doctor defendants admitted him for Bellevue Hospital's "financial

gain, thereby increasing their job security."  (Pl. Mem. 26).

Plaintiff states that he intends to introduce evidence at trial

documenting this widespread practice by the HHC.  (Id.).  No evidence, however, has been offered as of yet and plaintiff's mere reliance on his conclusory allegations regarding the HHC's practices fails to "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The City's motion for summary judgment is therefore granted as to the malicious abuse of process claim against the doctor defendants.

### 4.   Procedural Due Process

Plaintiff alleges that the City doctor defendants violated his right to due process before being deprived of a liberty interest because they failed to comply with the requirements of M.H.L. § 9.39.

#### a.   Applicable Law

The Second Circuit has recognized that involuntary commitment to a mental hospital cannot be executed by the State without due process of law.  Project Release v. Prevost, 722 F.2d 960, 971 (2d Cir. 1983) (citing O'Connor, 422 U.S. at 580 (Burger, C.J., concurring)).  It has further held that New York's overall statutory scheme outlining the process for involuntary commitment under the M.H.L. meets the requirements of procedural due process.  Id. at 971.  Where each of the relevant provisions of the M.H.L. have been followed, there is no procedural due process violation.  See Fisk, 501 F. Supp. 2d at 525-26.

### b.   **Application**

Here, the doctor defendants complied with each of the relevant provisions of the statute.  Indeed, plaintiff does not allege that any of the named doctor defendants violated the M.H.L.  Rather, plaintiff claims that a Dr. Nadrich, who is not a party to this action, falsified his medical records and the second M.H.L. § 9.39 certification in violation of the statute. (See Compl. ¶ 51; Pl. Mem. 25).  Plaintiff asserts that this violated his due process, and that the HHC should be held vicariously liable for this violation.  (See Compl. ¶ 51; Pl. Mem. 25).

Plaintiff's contention regarding Dr. Nadrich, however, does not change the undisputed fact that each of the named doctor defendants in this action complied with the relevant provisions of the M.H.L.  Further, plaintiff's argument that the HHC can be held vicariously liable for Dr. Nadrich's procedural due process violations fails because a municipal defendant cannot be held vicariously liable under § 1983 on a respondeat superior theory. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.") (emphasis in original).  The City's motion for summary judgment is therefore granted as to the procedural due process claim against the doctor defendants and the HHC.

5.   **Qualified Immunity as to Federal Claims Against the**

**Doctor Defendants**

The doctor defendants also argue that they are entitled to qualified immunity.  Because I am granting summary judgment as to their liability under § 1983 and dismissing the remaining state law claims against them, I do not reach the qualified immunity argument.

C.   **Federal Claims Against the Police Defendants**

1.   **False Arrest**

Plaintiff claims that the City police defendants violated his Fourth Amendment rights by subjecting him to false and improper arrest because they did not have probable cause to believe he had a mental illness and was a danger to himself or others.  The police defendants contend that because they did not formally arrest plaintiff or do anything to restrain or affect his movement and because plaintiff voluntarily agreed to wait in the lobby of the Prince George for EMS to arrive, no arrest of plaintiff occurred.  (City Mem. 15).  They further assert that even if plaintiff could demonstrate arrest, the seizure would have been constitutionally permissible because they had probable cause to believe plaintiff was a danger to himself or others.  (Id. at 15-16).  Moreover, even if probable cause did not exist, the police defendants argue that they are entitled to qualified immunity.  (Id. at 16-17).

The Court need not to determine whether as a matter of law the police defendants arrested plaintiff or had probable cause to arrest plaintiff.  Even if the seizure did violate plaintiff's Fourth Amendment rights, the Court concludes that the police defendants are entitled to qualified immunity for their actions, and therefore, the City's motion for summary judgment is granted as to the false arrest claim against the police defendants.  See, e.g., Anthony, 339 F.3d at 137 (declining to determine as a matter of law whether defendants had probable cause to arrest plaintiff, but affirming summary judgment because defendants were entitled to qualified immunity for their actions).

### a.   Applicable Law

The elements necessary to state a claim for false arrest under § 1983 are the same as those necessary to state a claim for false arrest under New York law.  See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified.  See Posr v. Doherty, 944 F.2d 91, 97 (2d Cir. 1991).

Probable cause to arrest is a complete defense to an action for false arrest, even where a person is ultimately acquitted, because it constitutes justification.  See Weyant, 101

F.3d at 852 (citing <u>Bernard v. United States</u>, 25 F.3d 98, 102 (2d Cir. 1994)); <u>see also</u> <u>Montalvo v. Jennings</u>, No. 93 Civ. 8351 (KMW), 1996 WL 148483, at *2 (S.D.N.Y. Apr. 1, 1996). "A warrantless seizure for the purpose of involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others." <u>Anthony</u>, 339 F.3d at 137 (quoting <u>Glass</u>, 984 F.2d at 58) (internal citation omitted).

The doctrine of qualified immunity shields police officers from personal liability for "official conduct that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 127 (2d Cir. 1997) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). An officer is therefore entitled to qualified immunity for false arrest if (1) it was objectively reasonable for the officer to believe that there was probable cause to make the arrest; or (2) if reasonably competent police officers could disagree as to whether there was probable cause to arrest. <u>See</u> <u>id.</u> at 128. In qualified immunity cases, the focus is not on the "correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." <u>Lennon v. Miller</u>, 66 F.3d 416, 421 (2d Cir. 1995).

Further, "[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." Anthony, 339 F.3d at 138 (internal citations and quotation marks omitted).

"[A] defendant is entitled to summary judgment on qualified immunity grounds when 'no reasonable jury . . . could conclude that it was objectively unreasonable for the defendant[]' to believe that he was acting in a fashion that did not clearly violate an established federally protected right." Lennon, 66 F.3d at 420 (first and third alterations in original) (quoting Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987)). An officer's actions are objectively reasonable if a reasonably competent officer would have acted the same way under similar circumstances. See id. at 420-21.

### b. Application

Here, the actions of the police defendants were objectively reasonable. There is no dispute as to what they knew or observed, or what occurred while they were at the Prince George, notwithstanding whether plaintiff voluntarily agreed to wait for EMS.

Although plaintiff offers the unsupported allegation in his memorandum that "no one advised the police officers that plaintiff had caused or threatened serious physical harm" (Pl. Mem. 12), his own deposition testimony stated that he overheard

Stacey Neri tell the police defendants that he "beat up a man in a wheelchair unprovoked." (Pl. Dep. 125:21-22). Neri confirmed this, explaining that she had "informed the police officers that there had been an incident in which Mr. Kraft had punched a tenant and had shoved our Security Director." (Neri Decl. ¶ 17). The police defendants also learned from Neri that plaintiff "had become verbally abusive to her" and "was not in the right state of mind at that point." (Bueno Dep. 27:25-28:7; Neri Decl. ¶ 17). Further, the police defendants took formal complaints from both Hansen and plaintiff. (Wells Decl. Ex. M at NYC 0266-73). Hansen accused plaintiff of being "verbally abusive," spitting on him, and attempting to punch him. (Id. at NYC 0266; Bara Dep. 29:10-16). According to Officer Bara, Hansen appeared more calm than plaintiff who "began to scream and yell at the top of his lungs." (Bara Dep. 29:18-21). Though plaintiff denies this, he acknowledges that he was talking loudly (Pl. Dep. 142:9-11) and was "totally upset and livid" at the time. (Id. at 142:24-43:4).

Further, the police defendants were aware that the radio call to which they had originally responded had been changed to a call concerning an emotionally disturbed person ("EDP") and that EMS was en route to evaluate plaintiff. (Bueno Dep. 27:9-10, 28:23-25, 30:11-19). Officer Bueno explained in his deposition what typically happens once police get an EDP call:

> Once we get a call of an EDP, automatically EMS is going to show up. EMS can make a decision right there and then, if they feel you don't need to go to the hospital, you go

> on your own way.  And if you need to go to
> the hospital, they'll take you to the
> hospital.  I'm not a doctor obviously.

(Bueno Dep. 30:9-19).  Officer Bueno added that police officers
do not make the ultimate decision whether someone is an EDP but
that they do sometimes decide whether to get EMS involved if they
think someone might be an EDP.  (Bueno Dep. 48:15-24).  Here,
neither officer remembers calling EMS, but Officer Bueno
testified that he believed "the social worker" (presumably Neri)
did.  (Bueno Dep. 27:8-17).  Officer Bara also testified that he
felt plaintiff appeared enough disturbed that a call for EMS was
warranted.  (Bara Dep. 42:6-9).  When the EMS workers and their
supervisor arrived, they spoke with the police defendants, and
both officers were still present when the supervisor made the
decision to transport plaintiff to Bellevue Hospital  (Pl. Dep.
155:20-56:13, 166:19-67:11).

Consequently, based on these circumstances, reasonable
officers in the defendants' position would have believed that
they had probable cause to seize plaintiff.  It is undisputed
that the police defendants acted in accordance with the EMS
supervisor's ultimate decision to transport plaintiff to Bellevue
Hospital, a decision that they believed was not within their
purview.  Such a decision was akin to instructions or orders from
a superior or fellow officer, which supports qualified immunity
when such instructions or orders are "apparently valid."  See
Anthony, 339 F.3d at 138.  Here, the EMS supervisor's decision
was apparently valid in light of the two 911 calls, the change of

- 31 -

the police radio call to an EDP, and the information provided to the police defendants and EMS personnel by Giordano, Hansen, and Neri.  The police defendants reasonably could have concluded, given the EMS supervisor's decision, that probable cause existed to seize plaintiff, and therefore, they are entitled to qualified immunity.  See id. (finding that because a sergeant's order to seize plaintiff for involuntary hospitalization was "an apparently valid order in light of the substance of the 911 call and all of the surrounding circumstances known to [the officers]," the officers reasonably could have concluded that probable cause existed to seize plaintiff and are thus entitled to qualified immunity).  The City's motion for summary judgment is therefore granted as to the false arrest claim against the police defendants.

### 2.  **Substantive Due Process**

Plaintiff asserted a substantive due process claim against the police defendants in his complaint.  The Stipulation and Order of Dismissal dated May 7, 2009 specified that the parties agreed to the dismissal of "[p]laintiff's due process claims" against the police defendants (Stipulation and Order of Dismissal ¶ ii); however, in a parenthetical, it only cited plaintiff's fourth federal claim, which is his procedural due process claim.  (Id.).  In the City's Notice of Motion for Summary Judgment, the police defendants moved for summary judgment on all of plaintiff's claims (City Notice of Mot. for Summ. J.) but failed to assert any argument regarding substantive

due process in their memoranda.  For the reasons stated in
Section C(1)(b), supra, and because no reasonable jury could find
the police defendants liable for substantive due process
violations against plaintiff, I dismiss, sua sponte, the
substantive due process claim against the police defendants.

D.   **Monell Claims Against the Municipal Defendants**

Because I have concluded that no reasonable jury could
find that the City doctor defendants violated any constitutional
rights of plaintiff, his claim against the HHC under Monell is
dismissed.  See Doe v. Smith, 704 F. Supp. 1177, 1188 (S.D.N.Y.
1988) ("[T]here can be no municipal liability where no
constitutional violations are found to have occurred."); Vassallo
v. Lando, 591 F. Supp. 2d 172, 202 (E.D.N.Y. 2008) (holding that
"no Monell claim can lie" where a court finds no constitutional
violation).

Plaintiff also alleges a Monell claim against the City
based on the actions of the police defendants.  A municipality
cannot be held liable under § 1983 solely on a theory of
respondeat superior.  Monell, 436 U.S. at 691.  A municipality
may, however, be liable under § 1983 when the alleged deprivation
of constitutional rights is the result of action pursuant to an
official municipal policy, id. at 690-91, or the municipality
exhibits deliberate indifference to the possibility of such a
constitutional violation.  Vann v. City of New York, 72 F.3d
1040, 1049 (2d Cir. 1995).  Plaintiff has not, however, produced
any evidence showing that any of the alleged constitutional

violations were a result of a City policy or the City's deliberate indifference.  Although plaintiff lists other cases in which other plaintiffs have made similar allegations with respect to their involuntary hospitalizations (Compl. ¶ 58; Pl. Mem. 29 & n.9), plaintiff alleges no facts and provides no evidence supporting a <u>Monell</u> claim.  Plaintiff's claim that the municipal defendants' unconstitutional customs and policies may be "inferred" (Compl. ¶ 58) from the list of cases fails to "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The City's motion is therefore granted as to the <u>Monell</u> claim.

**E.   <u>State Law Claims</u>**

Plaintiff asserts eight state law claims against defendants for (1) false arrest, (2) false imprisonment, (3) malicious abuse of process,[6] (4) intentional infliction of emotional distress ("IIED"), (5) negligent infliction of emotional distress ("NIED"), (6) prima facie tort, (7) negligent hiring and retention, and (8) negligent training and supervision. These claims arise from the same core facts set forth above. Because I conclude that based on these facts a reasonable jury could only find that defendants' actions with respect to plaintiff's transport and admission to Bellevue Hospital were

---

[6]     Pursuant to the Stipulation and Order of Dismissal dated May 7, 2009, the malicious abuse of process claim against the police defendants was dismissed.

proper, defendants' motions for summary are granted as to the
state law claims against them.[7]

### 1.   <u>False Arrest and False Imprisonment Claims</u>[8]

#### a.   <u>City Defendants</u>

Because I have already concluded that the doctor
defendants had probable cause and reasonable grounds for
believing plaintiff was subject to seizure under the M.H.L., <u>see</u>
<u>supra</u> Section B(2)(b), and because reasonable officers in the
police defendants' position would have believed that they had
probable cause to seize plaintiff, <u>see</u> <u>supra</u> Section C(1)(b),
plaintiff's state law claims for false arrest and false
imprisonment against the doctor and police defendants also fail.
The City's motion for summary judgment is therefore granted as to
the state law claims for false arrest and false imprisonment
against the doctor and police defendants.

#### b.   <u>CGC and CUCS Defendants</u>

For a private defendant to be liable for false arrest
or imprisonment in New York "'[t]he defendant must have
affirmatively induced the officer to act, such as taking an

---

[7]   Because I dismiss plaintiff's state law claims on the
merits, I do not reach the City's argument that dismissal with
respect to certain defendants is appropriate based on plaintiff's
alleged failure to file a proper and complete Notice of Claim
under General Municipal Law § 50-e.

[8]   "In New York, the tort of false arrest is synonymous
with that of false imprisonment." <u>Posr</u>, 944 F.2d at 96 (citing
<u>Jacques v. Sears, Roebuck & Co.</u>, 30 N.Y.2d 466, 473 (1972)).  As
stated in Section C(1)(a), <u>supra</u>, the elements of false arrest
under New York law are identical to those under § 1983.

active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition.'" Curley v. AMR Corp., 153 F.3d 5, 13-14 (2d Cir. 1998) (quoting 59 N.Y. Jur. 2d False Imprisonment § 37 (1987)). While "the plaintiff must prove that the defendant intended or instigated [his] confinement," King v. Crossland Sav. Bank, 111 F.3d 251, 257 (2d Cir. 1997) (emphasis in original), "'[a] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution.'" Carmellino v. N.Y. City Dep't of Educ., No. 03 Civ. 5942 (PKC), 2006 WL 2583019, at *61 (S.D.N.Y. Sept. 6, 2006) (quoting Levy v. Grandone, 789 N.Y.S.2d 291, 293 (2d Dep't 2005)), aff'd in part sub nom. Mauskopf v. Dist. 20 of N.Y. City Dep't of Educ., 299 F. App'x 100 (2d Cir. 2008) and Papusmiris v. Dist. 20 of N.Y. City Dep't of Educ., 299 F. App'x 97 (2d Cir. 2008).

Here, plaintiff fails to offer sufficient evidence that his transport and admission to Bellevue Hospital had been induced by the CGC or CUCS defendants to the point where Officers Bara and Bueno, the EMS workers and their supervisor, or the doctors at Bellevue were not acting of their own volition. While CGC and CUCS defendants did call 911 and provide information that led to plaintiff's seizure, Officer Bara specifically testified that

- 36 -

plaintiff appeared disturbed enough to him that he felt a call
for EMS was warranted.  (Bara Dep. 42:6-9) (emphasis added).
Officer Bara further testified that plaintiff was yelling and
screaming at the top of his lungs (id at 29:18-21), and though
plaintiff denies this, he admits that he was talking loudly (Pl.
Dep. 142:9-11), was "totally upset and livid" (id. at 142:24-
43:4), and Officers Bara and Bueno had to tell him to calm down.
(Id. at 140:10-12, 141:10-11, 142:9-10).  Further, doctors at
Bellevue Hospital stated that they not only relied on information
from collateral sources like Neri in deciding to keep and later
admit plaintiff, but also on what they learned about plaintiff
through their own observations and interactions with him.
(Greenberg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13).

          Plaintiff's argument that CGC defendants Giordano and
Franklin provided false information to police and EMS --
specifically, that plaintiff pushed Giordano and was seen
punching Hansen -- and that Nancy Porcaro, another CGC employee,
adopted such alleged falsities in her conversations with Neri and
police (Pl. Mem. 13-15) is without merit.  Plaintiff, himself,
admits to pushing Giordano (Pl. Dep. 90:6-7) and attempting to
punch Hansen several times.  (Id. at 17:19-23).  Whether
plaintiffs' actions were described to police and EMS as
"attempting to punch" or actually "punching" Hansen is
immaterial.  Further, plaintiff's contention that Franklin failed
to note in her security report that she did not see the start of
the altercation where Hansen was the alleged instigator and that

- 37 -

she erroneously noted that Hansen was sitting in his wheelchair (and not standing up) at the time (Pl. Mem. 14-15) is similarly insignificant.

Plaintiff's asserts that CUCS defendants Bradford and Neri were instrumental in his hospitalization due to the fact that Neri provided information to doctors at Bradford's direction, Neri and Bradford failed to report that Giordano had pushed plaintiff three times before plaintiff pushed him back, and since both defendants were social workers, police officers and EMS workers gave "great weight" to their conclusion that plaintiff needed to be psychiatrically evaluated. (Id. at 17-18). Plaintiff's contention is without merit. The fact that Giordano pushed plaintiff first does not change the undisputed fact that plaintiff shoved a CGC employee who was attempting to intervene and separate plaintiff and Hansen. (Giordano Dep. 92:11-25, 99:13-20). Further, as stated above, doctors at Bellevue Hospital did not rely solely on information provided by Neri in deciding to confine plaintiff. (See Greenberg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13). Finally, plaintiff offers no evidence that Bradford's or Neri's position with CUCS unduly influenced the judgment or decision of EMS or police to transport plaintiff to Bellevue Hospital.

Consequently, no reasonable jury could conclude that the actions of the CGC and CUCS defendants affirmatively induced plaintiff's seizure to the point where Officers Bara and Bueno, the EMS workers and their supervisor, or the doctors at Bellevue

Hospital were not acting of their own volition in the hospitalization of plaintiff.  The CGC and CUCS defendants' motions for summary judgment are therefore granted as to the state law claims for false arrest and false imprisonment.

### 2.   **Malicious Abuse of Process Claims**[9]

#### a.   **Doctor Defendants**

For the same reasons discussed in Section B(3)(b), supra, plaintiff's state law claim for malicious abuse of process against the doctor defendants also fails.  The City's motion for summary judgment is therefore granted as to the state law claim for malicious abuse of process against the doctor defendants.

#### b.   **CGC and CUCS Defendants**

Plaintiff argues that the CGC and CUCS defendants sought his confinement at Bellevue Hospital because they wanted to be "free of plaintiff at least for a while, and perhaps permanently."  (Pl. Mem. 26-27).  Even assuming that the CGC and CUCS defendants had an improper motive in seeking plaintiff's confinement at Bellevue Hospital, the objective or purpose of their actions -- removal of plaintiff from the premises for psychiatric evaluation and commitment -- is not outside the legitimate ends of the legal process at issue here, which is arrest and involuntary hospitalization.  The CGC and CUCS

---

[9]     The elements of a malicious abuse of process claim under § 1983 outlined in Section B(3)(a), supra, are identical to those under New York law.  See Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994) (internal citations omitted).

defendants' motions for summary judgment are therefore granted as to the state law claim for malicious abuse of process.[10]

### 3. IIED Claim

To prevail on a claim for IIED under New York law, plaintiff must prove the following four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress. See Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996); Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (1993). In analyzing an IIED claim, courts usually focus on the first element -- whether the conduct was extreme or outrageous. See Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999). Without "sufficiently outrageous" conduct, no claim for IIED can be established. Howell, 81 N.Y.2d at 122 ("[T]he 'requirements of the rule are rigorous, and difficult to satisfy.'") (quoting W. Page Keeton et al., Prosser & Keeton on Torts § 12, at 60-61 (5th ed. 1984))).

Here, plaintiff has not produced evidence sufficient for a reasonable jury to conclude that defendants' actions were extreme and outrageous or that he suffered severe emotional distress. As previously discussed, plaintiff's expert failed to find that the doctor defendants' decision to confine plaintiff

---

[10]    Because I dismiss plaintiff's malicious abuse of process claims on the merits, I do not reach the CGC and CUCS defendants' arguments that dismissal is appropriate because plaintiff supposedly did not plead or prove special damages with the requisite level of specificity.

substantially departed from accepted judgment, practice, or standards and even implies that plaintiff's initial confinement under M.H.L. § 9.40 was justified.  See supra Section B(1)(b) and note 5.  Further, I have already concluded that reasonable officers in the police defendants' position would have believed that they had probable cause to seize plaintiff.  See supra Section C(1)(b).  Finally, in light of what the CGC and CUCS defendants observed at Prince George regarding the incidents involving plaintiff, their actions, as alleged by plaintiff, do not amount to the sort of extreme conduct necessary to support plaintiff's claim here.  Defendants' motions for summary judgment are therefore granted as to the IIED claim.

### 4.   **NIED Claim**

Under New York law, a cause of action for NIED under the "direct duty theory"[11] arises "if [the plaintiff] suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety," Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996) (citing Kennedy v. McKesson Co., 58 N.Y.2d 500, 504 (1983); Green v. Leibowitz, 500 N.Y.S.2d 146, 148 (2d Dep't 1986)), or if the breach "causes the plaintiff to fear for his or her own safety." Matthews v. Malkus, 377 F. Supp. 2d 350, 361 (S.D.N.Y. 2005) (internal

---

[11]   In New York, a plaintiff may establish an NIED claim through either the "bystander theory" or the "direct duty theory." Mortise, 102 F.3d at 696.  Though plaintiff fails to articulate which theory he is asserting, based on the facts here, plaintiff seems to be alleging his NIED claim under a direct duty theory.

citations omitted).  "The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." Mortise, 102 F.3d at 696  (citing Johnson v. Jamaica Hosp., 62 N.Y.2d 523, 526-27 (1984)).  See, e.g., Hazan v. City of New York, No. 98 Civ. 1716 (LAP), 1999 WL 493352, at *5 (S.D.N.Y. July 12 1999) ("Although the City [of New York] has a general duty to prevent its police force from inflicting unreasonable harm on society at large, this duty was not a special one owed specifically to the plaintiff.") (internal citations omitted); Cucchi v. N.Y. City Off-Track Betting Corp., 818 F. Supp. 647, 656 (S.D.N.Y. 1993) ("The termination of an employee does not give rise to a claim for negligent infliction of emotional distress because a corporation owes the same duties to all employees.") (internal citations omitted).

Here, plaintiff has provided no evidence of any specific duty owed to him by defendants, particularly the CGC and CUCS defendants and the police defendants.  Plaintiff's complaint is void of any reference to such a duty (see Compl. ¶¶ 94-99), and plaintiff's assertion in his memorandum that "[t]here is no question that plaintiff can satisfy [the duty-owed] prong" (Pl. Mem. 39) is insufficient.  Further, while the police defendants may owe a general duty to the public, they did not owe any specific duty to plaintiff.  See Hazan, 1999 WL 493352, at *5. Morever, for the same reasons and facts discussed in Section B, supra, I conclude that no reasonable jury could find that the doctor defendants breached their duty of care to plaintiff by

admitting him to the psychiatric ward.  Even assuming they did,
plaintiff fails to offer sufficient evidence that such a breach
unreasonably endangered his physical safety or caused him to fear
for his physical safety.  Though plaintiff makes the bald
assertion that he "was afraid for [his] physical safety" while at
Bellevue (Kraft Decl. ¶ 6), he cites only two examples that fail
to sufficiently support his claim.  In the first, he describes a
tall, muscular patient who was "very aggressive and threatening"
towards one of the guards and who "frequently looked at
[plaintiff] in a menacing manner."  (Id. at ¶ 7).  In the second,
he alleges that when he refused to take his medication, a tall,
muscular guard told him, "'We can make you take it.'"  (Id. at ¶
8).  These instances do not amount to unreasonable endangerment,
and no reasonable jury could conclude that plaintiff legitimately
feared for his safety.  Defendants' motions for summary judgment
are therefore granted as to the NIED claim.

> **5.**     **Prima Facie Tort, Negligent Hiring and Retention, and**
>          **Negligent Training and Supervision Claims**

Plaintiff asserted additional state law claims for
prima facie tort, negligent hiring and retention, and negligent
training and supervision in his complaint.  Defendants moved for
summary judgment on these claims, devoting multiple pages in
their memoranda to them.  (City Mem. 23-25; CGC Mem. 13-16; CUCS
Mem. 12-13).  In his opposition, plaintiff does not address any
of these claims, and they are therefore deemed abandoned.  See Di
Giovanna v. Beth Isr. Med. Ctr., 651 F. Supp. 2d 193, 208 & n.108

- 43 -

(S.D.N.Y. 2009) (citing cases for proposition that plaintiff's failure to respond to argument made in summary judgment brief constitutes abandonment of claim).

**F.   Claims Against the Unnamed EMS Supervisor**

In his complaint, plaintiff asserted all of the foregoing claims against an unnamed EMS supervisor.  As of yet, plaintiff has failed to identify the EMS supervisor by name.  The City did not move for summary judgment with respect to the claims against the EMS supervisor.  For similar reasons stated above regarding the police and doctor defendants, and because no reasonable jury could find the EMS supervisor liable for his actions concerning plaintiff, I dismiss, sua sponte, all claims against the EMS supervisor.

CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted and all claims against defendants are dismissed.  The Clerk of the Court shall enter judgment dismissing the complaint, with prejudice.

SO ORDERED.

Dated:     New York, New York
           March 18, 2010

DENNY CHIN
United States District Judge

- 44 -